Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and States v. Davis, and Ms. Nagel will hear from you. Thank you. Good morning. May it please the Court, I am Patricia Nagel, appearing on behalf of Mr. William Scott Davis, Jr. Mr. Davis has raised quite a few issues in this appeal, beginning with whether or not he was even competent to stand trial, or sane at the time of the offense. This Court will recall that it issued an order to the trial court with instructions to conduct a new and initial competency hearing, and to vacate its order to restore Mr. Davis to competency. Rather, the trial court used a February 3rd, 2016 restoration order and certificate in lieu thereof, and found Mr. Davis competent and continued on. When this Court ordered that Court to vacate that order of restoration, implicit is any findings or reports or support that came out of it. So when the trial court held the competency hearing on June 5th, it basically did not rely on any new information as directed by this Court, it relied on information that it had compiled based upon this order that this Court specifically stated to vacate. So it's Mr. Davis's position that at that competency hearing, there was no real evidence to determine whether or not he was competent. And of course, it never got to the sanity at the time of the offense evaluation because the Court, primarily because the Court did not hold a new initial hearing, which typically piggybacks on the determination or finding of competency. So it is our position that to this day, there is no evidence as to whether or not Mr. Davis was competent to even stand trial and whether or not he was sane at the time of the offense. The major issue in this case has to do with sufficiency of the evidence regarding sending threatening communications and cyberstalking. Regarding the communications, there were three e-mails that were introduced to support these connections. Essentially, and Mr. Davis testified before us, that he was lanky and that was the government approved an act, the communications were sent, but they failed to prove that Mr. Davis had the And of course, an act without proof of the specific mens rea does not constitute a crime. In this case, Mr. Davis is essentially continuing the same conduct of ranting and raving that he has been engaged in or had been engaged in for seven years. He perceived that the subsequent convictions were the result of a conspiracy amongst the carrying police officer Savage, the district attorney who prosecuted him, Shakita, and the guardian ad litem, or the attorney appointed to represent the child's mother in the custody hearing. He uses the same language, the same words, the same descriptions, but he uses various different methods. He sued these people in state court, federal court, filed administrative proceedings against them. He sent them hundreds and hundreds of e-mails, phone calls, letters. Mr. Davis has sent were not a threat to injure these people. Rather, it's an attempt to continue to remind them of his perceived wrongful actions on their part and how he's going to continue to remind them as long as he lives, apparently, because he continues to rant to this day. And just as a prosecutor, Shakita, and the officer Savage to have Mr. Davis arrested and convicted for domestic violence against his wife for two years, and they were not successful as she refused to testify against him. Therefore, they decided that since in one of these instances, the child was present, that they were going to use that as a mechanism, I don't know, to punish Mr. Davis since they could not punish him criminally. As the investigation obviously went on, they discovered a forged birth certificate. The child was in school receiving services appropriately, and they were able to go ahead and get a criminal conviction of him. Mr. Davis' position has always been, okay, but, you know, fighting among adults, children are off limits. You used an illegal process to try and punish me, and essentially what you did was you separated me from my daughter, and you didn't do it in the right way. Now, of course, this is Mr. Davis' subjective intent and state of mind. I'm in no way saying that the outcome of these cases was inappropriate. So this is Mr. Davis' response to these three people, and it has been from the beginning. He perceives that, and so he uses words like kidnapping of his daughter, conspiracy, fraud on the court, et cetera, because this is his position that those are the tactics and methods used against him. His response to all of that is, I'm going to try to vindicate this wrong, and that's all the litigation, so forth and so on. So it's not enough to merely say, okay, Mr. Davis has used certain language that these complainants find offensive, therefore he's guilty or he has a criminal intent to commit this crime, because the court also would remember or recall Ms. Batch was constantly, she went directly to the district attorney to try to have him arrested for these emails. She didn't go through the normal process of calling the police, reporting it, and even when she went directly to the district attorney, it still took like seven months for them to even act on it. So if this was evidence of only specific intent to injure, I don't think it would have taken that long. And I think that also if the court looks at the first email that was sent, it was sent to over 100 people. So I don't see any evidence that any of those people, that any indictments were issued charging him with the same sending threatening communications to all of those people. And if you look further into the body of the email, not just the part that the government wanted to highlight, you see on page 917 of the appendix volume two, he's using that same F word all throughout there. He's saying that he's going to F a whole lot. Well, that's not really a quote. I want to say the word, but he says, quote, you motherfuckers tried to fuck me, unquote. Two paragraphs down, he goes, the reason with a talking like this, when they were fucking, and he uses the daughter's name over, they thought it was funny. So he's using the F word essentially to say, and as I say in my brief, there's more than one definition of that word. He's using it to say you screwed me over. You're not going to get away with it. Don't you have to address the operative words of that email? She referring to Shakita, will never be able to walk again or practice law. How do we interpret that? This is all metaphorical, because when you think about it, the apparatus that he described that he was going to use to effectuate this assault doesn't even exist. A ten mile long dick, 12 miles wide, but he doesn't even have that apparatus. That would be like telling a person that I'm going to shoot you in the face right now, except I don't have a gun. Mr. Davis is using a lot of colorful, metaphorical expressions to basically let them know I'm going to continue to remind you every day that you wronged me. And if we look at his past behavior, that's essentially what he's been doing. Like I said previously, he's been ranting all the way through. All of this litigation, all of these emails. So I don't think you can take it literally that that's exactly what he meant, especially when he doesn't even have a means of doing so. Does the record include what the jury was instructed it had to find with respect to that email? Did the jury have to find that it was an actual threat of harm? The jury had to find that it was a threat of harm. And that gets to the second prong in the threat and communications. But the point of that being that the jury found, I understand you say this is metaphorical and colorful, but non-threatening in some way. But the jury here found that it was threatening. And it's a little hard to see how you overcome that finding. Well, I think that the jury's finding has to be also put in the context of this 404B evidence and the extrinsic evidence, which I'll just kind of address right now. We have a situation where these three women, when they're called to testify, their character is boasted. They are eliciting evidence that they are volunteers. They serve on all these boards. They're these wonderful, glorying individuals. And that piggybacks on his limited right to cross-examine them on that. I think that because so much evidence went in that these people are just the best and just perfect in every way, surely the jury is going to feel like, oh, and at the same time, Mr. Davis' character is just The jury doesn't need to know that one of the allegations was strangulation of his wife. The jury doesn't need to know that he kidnapped his child. Isn't that part of the story? I'm sorry? Isn't that part of the story? In other words, those emails progressed over a period of time. And then according to the victims, the last three emails increased the nature of the threat so that they got physical. And they said they became terrorized. One checked her car every time. There was evidence that he would wait for her at the courthouse. The elevation of the issue and then the language like you'll never walk again or you'll never have a place to hide, God help you, these types of statements now get pretty serious against that background. They were not offered to prove those particular emails were violating the law. They were intended to prove the intent of these emails and the contrast between these three emails and the earlier ones. I think that's their purpose. Whether I agree or not is another question, but that's the presentation I believe the government made to the jury. Well, our position is it went too far. That the government could clearly have put in evidence that there was a domestic, there was a custody hearing involving where Ms. Batch was involved. Mr. Davis was not happy with the outcome that he had committed during the investigation of that. They discovered crimes he had committed. He was prosecuted for those and thus unhappy with Shaquita and Savage. That information could have been presented, but the same goal without that. And just as far as the language and escalating, as I pointed out in the brief, at one point he said, I'm going to quote unquote burn your ass up in court. I mean, nobody took that literally that he was going to set fire to them in court. So why, so the language didn't necessarily escalate. It's just different. Someone could perceive that as a threatening statement. And as far as waiting and leaving the courtroom and so forth, that goes to the issue of whether or not the threat was credible in terms of the victims perceived it to be a threat. That's a subjective statement on their part. The issue is, is it objectively reasonable for someone to interpret it that way? And when you have this seven-year backdrop of all this litigation, all of this statements, I'm going to burn your ass up in court, I'm going to do this, I'm going to do that, a reasonable person would not necessarily have taken the, you know, you'll never be able to walk again type of language any differently than the I'm going to burn your ass up in court language. I think that argument goes both ways. If this had been the first incident, I think you'd be arguing and maybe we would find it persuasive, there's never been any problems with this man and he had been harboring this in his heart for seven years and all of a sudden said this. And so they shouldn't have thought that there was anything wrong with him. He'd always acted properly. Now we have the converse. He's always had this incredible language directed at three women. And it's required to say, oh, well, there's no difference. This is just rhetorical language. And that's what your argument is because you're up against a jury verdict here, right? That's correct, Your Honor, but again, he's used this language before, but he's never acted out against any of these people. What I'm saying to you is that the jury could conclude that things are escalating. The fact that he's never acted before doesn't necessarily demonstrate he's not going to act now. Absolutely. That is correct. I agree with that. However, if you look at his past behavior, I think it's a pretty good road mapping indication of where he is and where he will be, which is ranting, raving, constantly reminding them of his perception of things. You're going to have some time on rebuttal. We'll hear it now from Mr. Sinnott. I didn't know if the court wanted me to address the other just real quickly on direct or just say everything for rebuttal. Why don't you bring it up for rebuttal? Okay. Sounds great. Thank you. What about the other one? The sentencing issue and whether or not that one point enhancement was appropriate and then the other ones will probably take like 30 seconds to just mention, but I'll wait and take that up. Thank you. Good morning, your honors. May it please the court. Javier Sinha on behalf of the United States. I'd like to quickly talk about Mr. Davis's competency and I'd like to quickly talk about the background facts of that because I know they're a bit complicated. Can you address the argument that your colleague began with, which was that we had ordered a certain thing with regard to competency and the district court didn't do that? So this court ordered a new competency hearing or determination. It did not order a new evaluation. Wait, start. Be specific. I thought we ordered a new determination. Correct. You said hearing and determination. I just want to be sure we're precise. Correct. It's a determination, yes. And it's pursuant to U.S.C., 18 U.S.C. 4241C, which discusses only competency hearings, initial competency hearings. So this court, I don't believe, vacated the evaluations below. And this court's opinion came down after the third evaluation was completed, which was a restoration evaluation, but essentially here there was no difference between that and initial competency evaluation because the third evaluators discovered that Mr. Davis was competent now to begin, and so there's no need to restore him at all. And then even after this court's opinion came down during the hearing, the evaluator testified at the hearing and, aware that this was now an initial competency hearing, determined that she stood by her evaluation and believed that Mr. Davis was competent to stand trial. And that also goes to the issue of Mr. Davis' sanity. I think it's a bit of a different case because sanity is an affirmative defense that the defendant has to raise and prove to a jury. But Mr. Davis was, in fact, evaluated for sanity in the first evaluation. Again, that wasn't vacated by this court's opinion. And the district court after that had no duty to either declare him insane or order a new evaluation for him. That was his burden to prove to the jury. So I think I understand your position is that what our order did was vacate the decision of the district court because the defendant had not been permitted to testify. Remanded to say make a new decision. You have to make a new decision because you left out information, but did not order that the district court could not consider any of the same information that had been considered previously. It just had to make a new determination based on all of the facts including any statement the district court had made. That's exactly right. So I guess moving on to the sufficiency of the evidence grounds, I'd like to quickly just explain that Mr. Davis didn't have to, or the government didn't have to prove that Mr. Davis had the intent to actually rape or assault these women. It had to prove he had the intent to make threats. And so whether or not he was actually going to carry out these threats wasn't part of what they had to prove. They had to prove these were true threats here, which the government did. What's true mean? You have to make a true threat. Give me what you understand the difference in the law between a true threat and a threat. So a true threat as the Supreme Court has defined it is whether an ordinary reasonable recipient aware of the context of the communications would find it to be a serious expression of intent to do harm. And that's how the jury was charged in this case. And so the jury found that Mr. Davis did have a, Mr. Davis' communications looked at by an objective reasonable person showed a serious expression of intent to do harm here. As for subjective intent, Mr. Davis' subjective intent was proven, as subjective intent is almost always proven by circumstantial evidence here. The evidence is quite clear. He sent these emails directly to the family. There's no hint of jest or conditional language. And I think the context here matters a whole lot. This came as the culmination of a years-long campaign of harassment and intimidation. And it seems to correspond with the dismissal of Mr. Davis' final federal lawsuits, which seems to be the triggering point that led him from sending intimidating harassing threats or emails to threatening emails. And I think it's clear that Mr. Davis testified at trial, and he said, I had no intent to threaten or harass. My intent was merely to vent my anger. And the jury presumably disregarded that when it found him guilty of this crime. I think the language... What is your response to her argument that it was a false, I think the word she used is apparatus, but in the description he gave was we should view that not as being a true threat. In essence, that it's equivalent, had he said, aliens are going to come down and do these terrible things to you. Why is that different, and what's your response to her argument there? So I think, it's unclear if she's referring there to the true threat element or the subjective intent element. For true threats, I think... Assume she's saying true threat. I think it's a jury question for the jury to look at the emails and go in the context, and I think the context matters a whole lot, and it's part of the standard that the Supreme Court has said must be considered for true threats. What do these emails seem to say? Do they show a serious intent, or excuse me, a serious expression of intent to do harm? And I think a jury could look at the context that these were years and years of emails and harassing letters and faxes and phone calls, the fact that Mr. Davis at the time was quite big and imposing, the fact that these were in fact true threats. Whether or not there was hyperbole in them, I don't think that matters as much as... Her argument is, I don't know if that addresses her argument. Her argument is that the proposed tool to carry out the threat is fantastical, and anybody reading it would say it's fantastical. I suppose your response is basically that the threat that you'll never walk again is real, and the tool is an exaggeration in order to make the point, but the tool proposed is fantastical. Correct. He uses hyperbole several times in that email. For example, the tool is fantastical. He references porn stars, references not using sexual lubricant, and whether or not that's... That's real, but the description of his sexual tool is unreal. That is in fact hyperbole, but I don't think that makes it less threatening. I think, if anything, the hyperbole makes the threat... But see, the thing is, if you go back to Judge Richardson's original question that started out this line, if he had said, for example, I have a group of people from Mars that are going to be coming and watching you every single minute, and they are going to get you soon, would that be a true threat? I think it depends on what a jury would determine whether a... That would still raise a jury question? I think it would, yeah. The question is whether a reasonable, ordinary person, if a jury determines that a reasonable, ordinary person receiving this threat would believe it to be... Would we allow a jury to consider threats from aliens from Mars? I don't know, Your Honor. I don't think we would. You just said it was a jury question, so we'd have to if it's a jury question. Yeah, I think it would be a jury question. I think... No, you don't. No, you don't. Think about that a little bit harder. I mean, the point being is that if the threat, as Judge Mott has described, was people from Mars are coming to watch you and the people from Mars are going to get you, that can't be a true threat because there are no people from Mars. In contrast, if you slightly change your hypothetical, I think what you're trying to get at is that if you said people from Mars are coming to watch you so that I can find you and come rape you, that may well be a true threat, even if it includes, as part of the aspect, a fantastical portion. That would be a context in which you have a fantastical element to a threat, but the ultimate threat, which is, so I can come get and rape you, that would be a true threat. Correct, yes. But I think you have got to acknowledge that so that these, what Judge Niemeyer has called these fantastical elements, are there and if they were there alone, you wouldn't have a true threat. I mean, you can't, everything can't be a true threat if it's made up of, you know, if it's made in a whole cloth, something that does not really exist. If you agree with Judge Mott, then it's not a jury question. Right. I think here that there's enough realistic threatening language for a jury to determine this was in fact a true threat. And I think... And you might also distinguish between fantastical, aliens, and hyperbole with respect to apparatus. Correct. That one is fantastical, the other is maybe somewhat more common hyperbole that is... Fantastical. Understood to be hyperbole as opposed to true, you know, fantasy with the folks in Mars. I think that's right, yes. Are you going to talk about the sentence? Absolutely. So Mr. Davis makes a few sentencing claims in this court. The first is that he should not have been given a two-level enhancement for obstruction of justice. The district court principally based that enhancement on the fact that he sent threatening letters to the victims here, both before trial and before sentencing. So I think that's perfectly okay. He also based it on the fact that the defendant perjured himself. Either one of those two bases would be enough to affirm this two-level enhancement. The Virginia conviction increased his criminal history point by one. Here the district court determined that according to this court's decision in Martin, basically the Virginia and North Carolina systems are materially the same, in that both give you a bench trial below and then a right to appeal for a jury trial. That appeal, as courts say, vacate or annuls the judgment below, but if you withdraw that appeal, the judgment below is reaffirmed. And this court said in Martin, that's essentially acting as a stay, and so the Virginia system basically acts the exact same way here. And ultimately I think any error there would have been harmless anyway, because the district court then went on to increase Mr. Davis' criminal history category from three to five, finding that only a level five could accurately describe his previous criminal history, as well as his likelihood of recidivism and committing future crimes. Mr. Davis also says that the district court erred by failing to depart downward. This court has said that it won't review those decisions unless the district court didn't know that it could do so. Here the district court made that decision on the merits, and it was clearly aware it could do so and just chose not to do it. Finally, I think it's substantively reasonable. This court does not assume that when a sentence is outside the guidelines range, it is presumptively unreasonable. Here the district court found that Mr. Davis was required the sentence for rehabilitation purposes, to really instill in him a respect for the law, because he seemed unable to stop emailing or sending letters to these victims with threats. So I think the sentence here was substantively reasonable. And finally, Mr. Davis... What was the final sentence? 144 months. And what was the guideline, Tom? Guidelines range... If you include every other thing that you... 125? Yeah, I think the high end was 125. No, that's including the upward departure, the 125. Yes, with the criminal history category of three, which would... I apologize, I don't think I understand the question. Yeah, I didn't understand that he had... He has three crimes here, right? Three counts of sending threatening communications and one count of cyber stalking. Correct. So what would be the guideline range, the basic guideline range? Tell me that first. For each individual crime? For all of them together. Without the upward departures? Yes. I don't have that on hand. I apologize. When you say departure, you mean enhancement or departure? Judge Motz's question is what is the guidelines without a variance or departure? I don't know that off the top of my head. I thought it was 125, but I may be wrong. I thought it was 70 to 87. Well, 125 is with the departure and... A departure? He departed up for the criminal history category. I think it's 70 to 87 to begin with. So it's 87 to 144, does that sound right? No, it's 70 to 87. I think you're right. It's 70 to 87 before the criminal history departure. The criminal history departure takes the top up to 125, and then there's an upper variance to the 144. Correct. Seems like a long sentence for these three crimes. So there's four counts. These four crimes. So it is a long sentence, but I think the district court forces discretion to apply a sentence based on the 3553A factors. And here Mr. Davis had shown that he needed a lot of rehabilitation. He refused to take responsibility here. He kept sending letters to these victims even after he was charged, after he was convicted. He seemed incapable of accepting that he was committing crimes here. He denied he did anything wrong. He denied sentencing. So I think the district court looked at all this and decided that only this sentence would satisfy the factors in 3553A. Is that about it? I believe so. If there are no further questions, I'm happy to rest on our briefs with the rest. Thank you. All right. Thank you. Ms. Navy. Thank you. Thank you. And just to jump right in at the sentencing question, it is 70 to 87 without the enhancements. So the top range of the guideline range within guidelines would be 87? 87, yes, sir. And it went from that to 144. And it's unreasonable in the sense that, you know, the factors suggest that the sentence be no longer than what is reasonable to. See, that's the problem. I know you don't, we lawyers don't control our clients, even though we would sometimes like to. But we've gotten, I don't know, how many motions, letters, whatever, since the appeal's been filed. I mean, he is, it may be that this was what was necessary, what was reasonable in this case. That's the difficult thing to know. Well, respectfully, first of all, the judge even said that there is no sentence he could impose that would deter the conduct. So if you're going to go from 87 to 144 after having made that statement, then anything above that is just arbitrary. And arbitrariness is abuse of discretion. So to the extent that, I don't know if there... See, that argument goes too far. What if your client had been a serial murderer and the judge said at sentencing, there's no sentence I can give that would be appropriate here? Well... We wouldn't say, well, we're going to let him free. Well, okay, they wouldn't go free anyway, Your Honor. But the reality is this judge is talking specifically about limiting or stopping Mr. Davis from continuing to communicate. That's one of the legitimate reasons for sentencing, one of the four, incapacitation, protecting the public from the conduct. I understand. And we're talking about these three specific people that he continues to email. Your point is this hasn't stopped him. Is that what you're... It hasn't stopped him. The court said it wasn't going to stop him. At least for a time. We're trying to determine how long a time, the possibility that the threat will become actuality. Well, as we can see, that has not happened. But even at the time, the judge contemplated that it wouldn't. I said the threat becoming actuality. There's something in this record that says that any of these people... Yes, I was just referring to, you know, if the court says there's nothing I can do to stop him from sending communications, then what is the purpose of all of this additional time? I mean, is there like a... A threat could carry it out if he's in public, whereas if he's incarcerated, he can't be carried out. So there's a victim at least feels the protection. I mean, I got a threat sent to me by a U.S. marshal that somebody was going to kill me, and he was in a prison in Texas, and the marshal assured me he's not getting out. That gave me a comfort that, I mean, it was a real threat. I must have done something wrong. Did you do this in Texas? I probably wrote a bad opinion. All I'm saying is, you know, if I think that goes too far to go from a three to a five, you know, contempt of court, I don't know if there are other show causes that could try and deter his conduct rather than giving him an arbitrary sentence that the court itself said would not happen. Just briefly about the conviction. I respectfully disagree with the government. This Virginia system is nothing like North Carolina. North Carolina will vacate the sentence, but the conviction stands. Virginia vacates the conviction and the sentence. That's why it's not a conviction. And just real briefly, just the self-representation argument had to do with his attorney not asking appropriate questions. And just real quickly, for the ineffective assistance, if I may just, like, have 30 seconds on that? Well, your clock's just turned red. Yes, sir. Take a minute. Okay, thank you, Your Honor. This is not just an issue of the attorney making a representation that he's going to reserve his closing, and then later he doesn't do it. This is ineffective assistance on its face because the trial attorney engages in a discussion about Mr. Davis and his right to testify, et cetera, without Mr. Davis being present. Mr. Davis has a right to be present at all stages of the proceeding. So for the trial attorney to deny him that, I think that is ineffective on its face. All right, thank you, Ms. Nagle. I understand you are court-appointed. Yes, sir. And I want to acknowledge that service. It's very valuable, and we appreciate it very much. Thank you very much. We'll come down and greet counsel and then proceed to the next case. Thank you.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Julius N. Richardson